FILED
2012 May-22  PM 03:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

MARTHALYNN EZELLE BARNES, )
          Plaintiff,       )
                      )
vs.                    )     CASE NO. CV 11-J-1334-S
                      )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,  )
          Defendant.     )

## MEMORANDUM OPINION

This matter is before the court on the record. This court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking reversal or remand of a final decision of the Commissioner. All administrative remedies have been exhausted.[1]

### Procedural Background

Plaintiff applied for Disability Insurance benefits and Supplemental Security Income benefits on July 23, 2007, alleging disability beginning March 23, 2007 (R. 60, 104-11) due to "a problem with her tail bone, the coccyx," fibromyalgia, a cervical bone spur, degenerative disc disease, and depression (R. 33-34, 48, 153). The administrative law judge ("ALJ") denied plaintiff's application on July 15, 2009 (R.

---

[1] Plaintiff filed a new concurrent claim on September 10, 2009, which was allowed at the hearing level before a different Administrative Law Judge on May 26, 2011, with an amended onset date of February 24, 2010. *See* Plaintiff's Br. (doc. 9) at 3.

1

12-28). The Appeals Council denied her request for review on February 18, 2011 (R. 1-3). The ALJ's decision thus became the final order of the Commissioner. *See* 42 U.S.C. § 405(g).  This action for judicial review of the agency action followed (doc. 1). The court has considered the entire record and whether the decision of the ALJ is supported by substantial evidence. For the reasons set forth below, the decision of the Commissioner is due to be **REVERSED**.

### Factual Background

Plaintiff is a 47-year old female with a high school education and a certificate in cosmetology (R. 34-35). She has one adult son who lives in her home with her (R. 42, 43). Her most recent full-time job was at a hair salon, from January to March of 2007 (R. 145), and she testified that she subsequently worked one day a week at a restaurant for a couple of months (R. 35-36, 39-40). Prior to these positions, in 2002 and 2003, plaintiff worked in a bank as a teller/microfilm mounter filming canceled checks (R. 39, 50).

Plaintiff testified that she is unable to perform any of her old jobs because she cannot sit or stand for long periods of time without pain in her back or extremities (R. 40-41). She also claims to have problems with depression, for which she requires antidepressants (R. 41-42). Plaintiff claims that her son takes care of most of the grocery-shopping and housework, and that she does not drive "unless [she] absolutely

2

ha[s] to" because her neck pain reduces her mobility and she has almost had multiple accidents as a result (R. 43-44).

Plaintiff fell at work, injuring her coccyx (tailbone), in September of 2007 (R. 36-37). Plaintiff testified that her doctor told her she required surgery for her coccyx injury because the bone was "totally broken" and "wasn't going to heal" on its own, but that neither insurance nor worker's compensation would pay for the surgery (R. 44, 46). Despite the "very painful" nature of this injury, plaintiff avers that it is not the principal reason for which she filed for disability (R. 48). Plaintiff also testified that she suffers from back pain due to degenerative disk disease, that she feels pain "all the time," and that the pain has been getting "worse and worse" over the years (R. 46-47). Plaintiff said that she gets uncomfortable if she is required to sit for more than a few minutes at a time, and that accordingly she spends "[p]robably three or four hours" per day laying down (R. 47-48). She testified that this pain is compounded by fibromyalgia and depression (R. 48).

In her Daily Activities Questionnaire, filled out on August 14, 2007, plaintiff wrote that she "seem[s] to be able to sleep no more than 45 minutes or an hour at a time" and that she requires help with personal and financial needs (R. 132). She laments that "[s]ince I don't sleep good at night and because of medications I usually nap for a bit [during the day] and this cycle continues all day" (R. 137). She is able to

3

prepare and cook meals "with . . . help" and is able to perform "light cleaning . . . most of the time" (R. 133), though she says she cannot use a vacuum cleaner because of her right arm pain (R. 139). She is unable to tend the garden (R. 140) or to lift groceries (R. 141). She says her son must be present when she is cooking because of "concern[] that I will forget and start a fire" (R. 139). Her mobility is limited because she "can't lift certain things or reach for or bend down for items, and she claims she is "very tired and ache most of the time" (R. 133-34, 140). Plaintiff states she can perform a task or chore for no longer than fifteen to twenty minutes before needing a break, that she "can't lift heavy objects or do strenuous activities," and that she will "tire very easily" and "loose [sic] [her] train of thought when trying to carry on a conversation" (R. 135). She wrote that [s]ome days it hurts to even move," and due to limited mobility "it is hard to keep up some personal hygiene" (R. 137). Plaintiff is "scared" to drive because of the medications she takes (R. 141).[2] She claims she has been fired from recent jobs cutting hair because she cut hair too slowly, and that she was fired from other jobs because she "ache[d] so bad it is hard to get out of bed," and she would miss work (R. 135). Because she cannot work she has no health insurance (R. 142).

_____

[2] Plaintiff listed the following daily medications on the Daily Activities Questionnaire: Hydrocodone, 5 times/daily, for pain; Valium, 2-3 times/daily, for stress; Zanaflex, 3 times/daily, for muscle spasms; and Lexapro, 2 times/daily, for depression (R. 142). On her Pain Questionnaire, plaintiff wrote that she takes 10 mg of hydrocodone 5 times per day, and has done so for "3-4 years" (R. 143-44).

Plaintiff has a long history of back, neck, and shoulder pain, as well as more generalized complaints of joint pain. She also has a long history of depressive mood or anxiety disorder. On her pain questionnaire, plaintiff wrote that her pain began in 1990 (*see, e.g.*, R. at 372-79), "has gotten worse since then," and has worsened "considerably" since 2001 (R. 143-44). She wrote that "fibromyalgia makes me ache all over but the pain from a bone spur is mainly in the neck and shoulders," and is slowly moving into her right arm and hand and "sometimes into the left shoulder and arm" (R. 143). The pain is exacerbated by "activity," and is "constant" (R. 143). She says that "nothing relieves the pain totally but the medications help but cause other side effects" (R. 144).

Unsigned medical records from July 2, 1999, state that plaintiff returned to the the physician after a two year absence and had been "doing well," but the author of the records noted that plaintiff was "stressed out," her heart was "racing," she was crying, and she "is having problems here" (R. 355). She was noted to be doing "better" at a follow-up on July 16, 1999 (R. 354), and on August 25, 1999, it was noted that plaintiff quit her job and since had "much more peace of mind [and is] feeling better" (R. 353).

On December 6, 1999, plaintiff visited her primary care physician, Dr. David Kimbrell, complaining of a "panicky feeling" and "several episodes of fright mainly

associated with a group of people" (R. 351). She was diagnosed with chest pain associated with hypertension, for which she was prescribed Zebeta,[3] 5 mg/day, and anxiety, for which she was prescribed Klonopin,[4] 1 mg/twice daily, and Serzone,[5] starting at 50mg/twice daily and slowly increasing to 100 mg/twice daily (R. 351). On December 28, 1999, plaintiff returned to Dr. Kimbrell for Graded Exercise Testing ("GXT") (R. 349, 397-411). The GXT was "clinically [and] electrically negative" (R. 397). On January 18, 2000, Dr. Kimbrell noted during a subsequent follow-up that plaintiff had "[s]ignificant anxiety disorder"; he increased both her Klonopin, to "1 mg up to three times a day," and her Serzone, to 150 mg/twice daily, and continued her Zebeta as before (R. 347).

On March 17, 2000, Dr. Kimbrell expanded his diagnosis to include "[s]ignificant generalized anxiety disorder with insomnia," continued the Klonopin as needed, and discontinued the Serzone, instead prescribing Trazodone,[6] 25 mg/daily to

---

[3] Zebeta is a brand name of Bisoprolol, a generic drug used to treat hypertension. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000927/ (last visited May 16, 2012).

[4] Klonopin is brand name of Clonazepam, a generic drug used to treat panic disorder. *See* PHYSICIANS' DESK REFERENCE 119 (PDR Network, LLC, 2011).

[5] Serzone is a brand name of Nefazodone, a generic drug used to treat depression. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000956/ (last visited May 16, 2012).

[6] Trazodone is a generic drug used to treat major depressive disorder. *See* PHYSICIANS' DESK REFERENCE 127 (PDR Network, LLC, 2011).

"see how she tolerates it," and Celexa,[7] 10 mg/daily for one week, thereafter 20 mg/day (R. 346). He also noted that plaintiff had "[c]arpal tunnel syndrome on the right" and recommended a wrist splint (R. 346).

Plaintiff first visited a Dr. Jeffrey Wade on June 14, 2000, having been referred by Dr. Kimbrell after complaining of chronic left elbow pain (R. 345). She was diagnosed with lateral epicondylitis and given an injection to aid inflammation, pain medication, and was prescribed a strap to wear (R. 345). She followed up several times over the subsequent couple of months (R. 342-44). On one of these occasions, Dr. Wade noted that plaintiff reported having missed a month and a half of work (R. 343).

On March 19, 2001, plaintiff reported to Dr. Kimbrell that she was diagnosed with fibromyalgia by a physician in Columbus, Georgia (R. 341). On that date, plaintiff "became tearful . . . , admitted that she had been on . . . Prozac and it had helped in the past but the sexual dysfunction is intolerable." *Id.* Dr. Kimbrell noted plaintiff was "tender in multiple sites for fibromyalgia." *Id.* The medication for her anxiety disorder was modified; plaintiff was now taking 1 mg of Klonopin up to three times daily, and Dr. Kimbrell reported both that he would "[g]et [plaintiff] on Prozac or Sarafen 20 mg

---

[7] Celexa is a brand name of Citalopram Hydrobromide, a generic drug used to treat depression. See Physicians' Desk Reference 119 (PDR Network, LLC, 2011).

a day"[8] and that he gave her samples of Zanaflex,[9] 4 mg to take daily at bedtime.

On November 9, 2001, plaintiff saw Dr. Kimbrell complaining of numbness in the right hand and arm pain; a nerve conduction study revealed findings "compatible with but not indicative of a minimal right carpal tunnel syndrome" (R. 391). An MRI of the cervical spine taken on October 8, 2003, and reviewed by Dr. Bunker revealed degenerative changes at C6-7 and no other abnormalities (R. 384).

On February 7, 2003, plaintiff first saw Dr. Timothy Bunker at the Birmingham Pain Center, complaining of "constant ongoing aches [and] pains throughout [her] body" (R. 328, 323-330). She had follow-up visits on February 10 and 27, when she complained about neck and shoulder pain, and examination revealed cervical crepitation (R. 321-22). On March 12, 2003, and May 6, 2003, she again visited Dr. Bunker complaining of fibromyalgia and neck and shoulder pain (R. 312-20). She was noted to be working at Regions Bank (R. 319) and her sleep had improved (R. 312). Dr. Bunker formally diagnosed plaintiff with fibromyalgia during these visits (R. 312, 319, 539).[10]

---

[8] The records do not indicate which, if either, of these drugs Dr. Kimbrell prescribed on that date.

[9] Zanaflex is a brand name of Tizanidine, a generic drug used to treat muscle spasm. *See* PHYSICIANS' DESK REFERENCE 127 (PDR Network, LLC, 2011).

[10] Plaintiff's medication regimen changed frequently during this time; she was prescribed various medications in response to her complaints of pain. *See* R. at 312, 317-19.

On June 11, 2003, Dr. Bunker reported that plaintiff was "tolerat[ing] more activity" and "doing better overall" (R. 310). On August 11, 2003, plaintiff visited Dr. Bunker with complaints of fibromyalgia, neck, and shoulder pain, elbow and hand discomfort, and low back pain (R. 308-09). Carpal tunnel syndrome was listed as a possible cause (R. 308). On October 6, 2003, plaintiff returned with the same complaints (R. 306-07). An MRI was scheduled for her cervical spine (R. 304, 307), which revealed mild degenerative changes at C6-7 (R. 301).

On December 1, 2003, plaintiff followed up with Dr. Bunker for cervical pain and fibromyalgia with a reported pain level of six on a ten-point scale (R. 301-02). Dr. Bunker identified myofascial syndrome and cervical spondylosis without myelopathy (R. 536). On January 6, 2004, Dr. Bunker performed a series of ten medial branch blocks on both sides of discs C3 through C7 (R. 296-300, 534).

Plaintiff saw Dr. Bunker on March 21, 2004, and complained of fibromyalgia, neck and shoulder pain and myofascial syndrome after experiencing muscle flare-ups while preparing to move out of her residence (R. 294). On May 25, 2004, plaintiff reported pain ranging from four to nine on a ten-point scale, and an increase in stress (R. 292). Plaintiff called Dr. Bunker's office on June 2, 2004, seeking work excuses both for time already missed and for the next two weeks (R. 291). She returned to Dr. Bunker with complaints of fibromyalgia, neck and shoulder pain on July 22, 2004 (R.

9

289-90), September 21, 2004 (R. 287-88), November 16, 2004 (R. 285-86), January 11, 2005 (R. 283-84), and March 1, 2005 (R. 281-82), and each time was prescribed Lortab, 10 mg/daily,[11] Zanaflex, 10 mg/1-3 times daily, Lexapro,[12] and Flexeril, 10 mg/daily as needed for muscle spasm.[13] Plaintiff would continue to take some combination of these medications off and on for the next several years.[14] On the March visit, plaintiff noted she had been working seven days per week and taking care of her mother and children (R. 281) Dr. Bunker also prescribed Seroquel (R. 281-82),[15] and his treatment notes note a diagnosis of localized osteoarthrosis in the shoulder region (R. 527).

On January 18, 2005, plaintiff was seen at Brookwood Internists with complaints of depression, fibromyalgia, and insomnia (R. 192-93). No change in her

---

[11] Lortab is a brand name of an acetaminophen/hydrocodone bitartrate mixture, a generic drug used to treat pain. *See* PHYSICIANS' DESK REFERENCE 117 (PDR Network, LLC, 2011).

[12] Lexepro is a brand name of Escitalopram, a generic drug used to treat syptoms of depression and anxiety disorder. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214/ (last visited May 16, 2012).

[13] Flexeril is a brand name of Cyclobenzaprine, a generic drug used to treat muscle spasm and pain. *See* Physicians' Desk Reference 120 (PDR Network, LLC, 2011).

[14] An extensive partial catalog of her medication schedule is included in the treatment records. *See* R. at 213-17, 233-64, 540-42.

[15] Seroquel is a brand name of Quetiapine, a generic drug used to treat symptoms of schizophrenia, bipolar disorder, and depression. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030/ (last visited May 16, 2012).

10

condition was noted in a follow-up on August 2, 2005 (R. 190-91).

Treatment notes from May 3, 2005, and June 1, 2005, note that Dr. Bunker added Valium, 5 mg/daily, to plaintiff's treatment regimen due to stress over a custody battle with her ex-husband (R. 279-80).

Plaintiff was seen by Dr. Bunker on July 26, 2005, again with complaints of fibromyalgia, neck, and shoulder pain (R. 275-76, 524). She reported good days and bad days, and an increase in stress due to court battles with her ex-husband and her mother's cancer (R. 275-76). Treatment notes include a diagnosis of myofascial syndrome and osteoarthrosis, localized primarily in the shoulder region (R. 524). Plaintiff was seen again on September 27, 2005 (R. 272), and November 29, 2005 (R. 271, 522). On the latter of these two visits, plaintiff reported pain mostly in the neck and shoulders which had increased due to working long holiday hours, and interrupted sleep (R. 271).

Plaintiff was seen again at Brookwood Internists on October 28, 2005, complaining of pain after injuring her knee in a car accident (R. 187-89). An x-ray of the knee taken on that day revealed "no abnormality" (R. 187). An MRI taken on November 7, 2005, showed a small bone effusion and "[a] moderate sized fluid collection . . . anteriorly and medially in the soft tissues of the knee external to the knee joint" (R. 184). By December 6, 2005, the knee had improved and plaintiff had

returned to work, though she reported having been more depressed of late (R. 182-83).

On January 31, 2006, Dr. Bunker recorded plaintiff stating that her pain was mostly controlled and that her work was "going better" and she was able to work a five-hour shift (R. 269-70). A change in this status was reflected in treatment notes from April 4, 2006, when plaintiff again complained of fibromyalgia, neck and shoulder pain that was exacerbated by "consistent activity" and "stress" and described as a dull ache (R. 267-68). Dr. Bunker noted that plaintiff "need[ed] to find a way to make more time for herself" (R. 268).

On April 30, 2006, plaintiff visited the UAB-West emergency room complaining of moderate left elbow pain following a fall (R. 716-21). X-rays revealed a "nondisplaced fracture of the radial head with small joint effusion," with a "[f]racture line [that] extends to the articular surface" (R. 721). Plaintiff was discharged after having been outfitted in a splint, with instructions to carry her arm in a sling (R. 714, 719-20). Records from a June 19, 2006, follow-up show that the fracture was "well healed" with "no signs of displacement" and "no pain" (R. 705).

On June 6, 2006, plaintiff reported no significant change in her level of pain, and that it "waxes and wanes" (R. 265-66, 519). Dr. Bunker noted that the chronic neck and shoulder pain could be myofascial syndrome (R. 266). On August 8, 2006, plaintiff's pain was noted to be about the same, but the intensity was a "little worse"

(R. 517). Plaintiff also reported feeling more depressed in the last month due to the death of her mother (R. 516-17). Records indicate her dosage of Valium had increased to 10 mg/daily at bedtime (R. 514).

On October 19, 2006, plaintiff reported that she was completely out of her pain medications, which were refilled, and that she had been fired from her job for missing too much work (R. 209, 511). On December 14, 2006, she reported that her pain manifested itself as "aches, tightness, [and] pops [and] catches" and that it was exacerbated by stress and "insomnia" (R. 210). Her pain level without medicine was noted to be 8-9 on a 10-point scale, and 2-3 on her medication (R. 210). She also reported that her husband had died and that she could not afford counseling (R. 211).

On February 13, 2007, plaintiff reported "ache with sharp pain occasionally," with arm pain that included numbness in her thumb, that was exacerbated by "lifting," and noted that though she had returned to work, she was having problems there (R. 197-98). Treatment notes include observation of "degeneration of cervical intervertebral disc" (R. 496).

On February 26, 2007, plaintiff noted that both her pain level and her level of activity were "worse" since her February 13 doctor visit (R. 203). On that date, Dr. Bunker performed a fluoroscopically guided cervical epidural steroid injection at C7-T1 as treatment for cervical degenerative disc disease and spondylosis with radicular

13

symptoms (R. 199-203, 485, 491-92).

On April 10, 2007, plaintiff reported that she felt pain "all of the time," that her pain level without medicine was 7-10 on a 10-point scale, and that her pain level with medicine had increased to 4-5 on a 10-point scale (R. 204). Dr. Bunker observed that Lortab was no longer adequately controlling her pain, and that she was "quite depressed" (R. 205). Plaintiff's medication regimen was augmented with methadone, 10 mg/daily, to help treat her pain (R. 205).

By June 5, 2007, plaintiff reported feeling pain most in her collarbone, as well as continuing numbness in her right thumb (R. 206-07). She also reported losing another job (R. 207). Dr. Bunker believed the pain in the thumb to be radicular, and the clavicle mechanical pain (R. 207).

In a letter dated August 2, 2007, Dr. Bunker stated

> [Plaintiff] is a patient whom I've been treating for chronic intractable pain in the neck and shoulders. She has been diagnosed with Cervical Degenerative Disc Disease with radicular symptoms. She also has a secondary myofascial syndrome. This condition is very debilitating and makes it difficult for her to tolerate work as a hairdresser.

R. at 465, 625.

On August 8, 2007, plaintiff reported a pain level without medicine of 10 on a 10-point scale (R. 461). Dr. Bunker noted that plaintiff was not tolerating the

Methadone well (R. 462). On August 13, 2007, Dr. Bunker performed a fluoroscopically guided diagnostic block to the medial brach of C3-C7 on both sides as treatment for "Neck Pain of facetogenic origin presumptively of the C3/4, C4/5, C5/6 and C6/7 zygoapophyseal joints bilaterally" (R. 194-96). Plaintiff reported "relief of the facetogenic neck pain immediately after the procedure" (R. 196).

In a Physical Capacities Evaluation (R. 628-32) dated September 10, 2007, Dr. Bunker opined that plaintiff could be expected to lift ten pounds occasionally or less frequently; could sit four hours and stand or walk two to three hours in an eight-hour workday, that she should never push or pull, only occasionally climb stairs or ladders, balance, bend, stoop, or reach; and never work around hazardous machinery or pulmonary irritants (R. 628). He also rated plaintiff's pain level as distracting to the adequate performance of daily activities or work and noted that physical activity would "[g]reatly increase[] pain and to such a degree as to cause distraction from tasks or total abandonment of tasks" (R. 629). He drew the same conclusion with respect to plaintiff's fatigue and weakness (R. 631). He further stated that plaintiff would have negative effects in her performance of daily activities or work due to her pain, fatigue, and weakness, and that her symptoms were consistent with her underlying medical condition (R. 630-32).

Plaintiff was seen at the UAB-West emergency room on September 8, 2007,

15

with complaints of pain radiating down her right leg following a fall at work (R. 724-30). An X-ray revealed "age-indeterminate fracture of the coccygeal tip with anterior override of the fracture fragment" (R. 729). In a follow-up with a Dr. Dory Curtis on September 10, 2007, Dr. Curtis noted that plaintiff "look[ed] uncomfortable" and "walk[ed] hesitantly," with bruising and tenderness surrounding her coccyx (R. 641). Dr. Curtis advised patient not to work for a week, noted plaintiff may need to miss more than a week of work, and prescribed pain medication and "some therapy"(R. 641). A week later, on September 17, 2007, plaintiff had less pain and was walking better, but was still able to stand only for a few minutes and had to shift positions frequently (R. 640). Dr. Curtis noted that it seemed "unlikely" that plaintiff could work at that time due to her pain (R. 640).

On September 29, 2007, a consultative examination report was issued by Dr. Raveendran Meleth (R. 593-96). Plaintiff was noted to get up "stiffly" and walk slowly, and could squat up to 50 degrees but complained of back spasm (R. 595). She exhibited mild tenderness on the right side of the neck, with spastic neck and lumbar spine movements, and restricted shoulder motion on both sides (R. 595-96). Plaintiff was diagnosed with (i) chronic body and joint pains, (ii) a history of fibromyalgia, (iii) neck pain due to mild degenerative joint disease with no signs of radiculopathy, (iv) arthralgia of both shoulders, (v) a limited range of motion of her lumbar spine with no

16

sciatica, and (vi) anxiety and depression (R. 596). Dr. Meleth noted that plaintiff had been "very tearful" throughout the clinical examination (R. 596).

On October 1, 2007, plaintiff followed up with Dr. Curtis, who noted that plaintiff's pain had decreased, but that she still could not sit well and tended "to lean off to the side" (R. 639). Her impression was to "keep [plaintiff] on the same restrictions she was on previously but apparently that prevents her from working" (R. 639). On October 8, 2007, Dr. Curtis noted that plaintiff was walking comfortably but sat without placing weight on her coccyx region (R. 638). Dr. Curtis opined that plaintiff "could perform some sort of work," but because it was "difficult to put an exact time limit on sitting, standing, or walking," wrote that "these be restricted to tolerance because there is no clear objective way to measure pain" (R. 638). Dr. Curtis opined that plaintiff should not drive because she "has to take a fair amount of narcotics" and noted that "it sounds like she is not planning to work" (R. 638). X-rays taken October 18, 2007, showed no indications that the coccyx was healing (R. 637).

Plaintiff followed up again with Dr. Curtis on October 29, 2007, complaining that she still had "constant pain that prevent[ed] her from standing or walking more than about ten or fifteen minutes" (R. 636). Dr. Curtis opined that plaintiff looked "very uncomfortable" and was "still exquisitely tender over the coccyx" (R. 636). Dr. Curtis's impression was that plaintiff's pain was "much worse than I would expect

17

with this problem but sometimes patients have severe pain" (R. 636). Dr. Curtis opined that plaintiff would be "helped best" by a coccygectomy (R. 636).

On November 26, 2007, plaintiff again followed up with Dr. Curtis (R. 635). Plaintiff complained of "burning stinging pains down the right leg" which "radiate all the way down to her foot" (R. 635). She was noted to walk well but lean to the left, with a positive straight leg raise on the right causing burning pain that goes into the calf (R. 635). An X-ray revealed "some calcification indicative of healing around the coccyx but it is sitting in a fairly displaced position anterior to its normal attachment" (R. 635). Dr. Curtis noted weakness consistent with an L4-5 herniation and pain down the leg consistent with a radiculopathy (R. 635). Dr. Curtis observed that plaintiff had been denied a coccygectomy (R. 635). *See* R. at 690-91, 694-95.

Plaintiff was again seen by Dr. Curtis on December 10, 2007, still complaining of severe pain (R. 655). X-rays and physical examination were inconclusive (R. 655). Dr. Curtis opined that plaintiff should have undergone a coccygectomy "weeks ago" (R. 655).

On April 22, 2009, plaintiff was seen for an examination by rheumatologist Bryan Dewees (R. 731-40). His report notes that plaintiff began having neck and shoulder pain in approximately 1995, for which she had numerous treatments over time which were not particularly helpful (R. 731). The pain became gradually worse until

18

plaintiff began visiting Dr. Bunker at the Birmingham Pain Center in 2003 and was diagnosed with cervical degenerative disc disease with radicular symptoms (R. 731). Dr. Bunker's letter of August 2, 2007, confirms this (R. 625, 731). Plaintiff reported having been treated with numerous nerve blocks which helped her, and also required numerous pain medications (R. 731). Plaintiff reported pain in the posterior neck that goes to the right shoulder and down to her lower back, and stated that if she sits in one position for a long period of time she has flares of pain in her neck, shoulders, lower back, and legs (R. 731). She said that if she lifts anything with her right hand it is very painful, and that she can only lift her purse, which is three pounds (R. 731). She is not able to bend over, stoop, crawl, or climb, and said she has to lie down most of the day because of the pain in her neck, shoulders, and right arm (R. 731).

Dr. Dewees diagnosed plaintiff with (i) neck pain related to degenerative disc disease of the cervical spine; (ii) right radicular arm pain related to this disease; (iii) lower back pain; (iv) fatigue related to her disease; and (v) depression (R. 732). He concluded his report by noting that plaintiff has severe neck pain, right arm pain, and suffers from constant chronic plain, that these symptoms are confirmed by her medical records, and that he did "not feel that she could work at any job eight hours a day, forty hours a week, fifty weeks a year even if such a job were of a light or sedentary nature. In other words . . . she is totally and permanently disabled by her above outlined

medical problems" (R. 732).

On that same date, Dr. Dewees also opined that plaintiff could be expected to sit one hour and stand or walk one hour in an eight-hour workday; that she should never push or pull, climb stairs or ladders, balance, bend, or perform fine or gross manipulation; that she could only occasionally stoop or reach; and that she could never work around hazardous machinery or pulmonary irritants (R. 736). He also rated plaintiff's pain level as distracting to adequate performance of daily activities or work, and that such activity would increase pain upon exertion (R. 737). He further stated that plaintiff would have negative effects in her performance of daily activities or work due to fatigue or weakness, and that these symptoms were consistent with her underlying medical condition (R. 738).

Plaintiff has a history of anxiety and panic attacks dating at least to 1996 (R. 359), and was taking Klonopin to treat panic disorder as early as 1994 (R. 365). On April 22, 2002, plaintiff reported to her primary care physician, a Dr. Kimbrell, that she had stopped visiting her psychiatrist for financial reasons (R. 333).

On January 18, 2005, plaintiff was seen at Brookwood Internists with complaints of depression, fibromyalgia, and insomnia (R. 192-93). Her depression was noted to be improving with medication, but that significant stressors in her life were present (R. 193). No change in her condition was noted in a follow-up on August 2,

20

2005 (R. 190-91).By December 6, 2005, plaintiff reported having been more depressed of late (R. 182-83). Records from an August 1, 2006, follow-up note that plaintiff's mother had died and that her depression had worsened as a result (R. 178-79).

John Neville, Ph.D., performed a psychological evaluation on plaintiff on September 27, 2007 (R. 589-92). He concluded that her panic attacks were too infrequent to warrant a Panic Disorder diagnosis, and that though plaintiff has some anxiety, "overall a diagnosis of Major Depressive Disorder appeared most suitable for her" (R. 591). He also recommended psychiatric treatment and psychotherapy, and opined that her psychological prognosis over the next six to twelve months if she is in treatment is considered fair to good (R. 591). Notably, he opined that plaintiff's ability to respond appropriately to coworkers was "mildly impaired" and that her ability to cope with ordinary work pressures appeared "mildly to moderately impaired" (R. 591).

At the hearing before the ALJ, the Vocational Expert ("VE") was presented with numerous hypothetical situations involving an individual with symptoms similar to the plaintiff's. First, the VE testified that plaintiff's work as a bank teller would transfer into "sedentary clerical-type activities" including (but not limited to) billing clerk, route clerk, or order clerk (R. 51-52). He then testified that these jobs would still be available to a hypothetical individual who is "capable of occasional work postures to include climbing ramps or stairs, balancing, stooping, kneeling, crouching or crawling,

21

and never climbing ladders[,] ropes or scaffolds" (R. 52). None of these jobs would require overheard reaching, exposure to any "hazards such as unprotected heights," or exposure to extreme cold or heat (R. 52-53).They would also allow a change in position such that the hypothetical individual would not "be sitting in a prolonged posture for 25 minutes or more without the opportunity to stand and take a short stretch" (R. 53). The VE testified that these jobs would involve casual and informal contact with the general public, coworkers and supervisors that is not "intensive, prolonged or constant" (R. 54). Finally, in response to the ALJ's hypothetical of an individual who is "not able to complete an eight-hour workday, 40 hours a week or an equivalent schedule on a regular and continuous basis," the VE testified that such individual "would not be able to meet the production requirements of work and would not be able to perform any of [the plaintiff's] past work, would not be able to perform any of the [hypothetical] jobs . . . listed, . . . and would not be able to perform any work at any exertional level" (R. 55-56).

## Standard of Review

In a Social Security case, the initial burden of establishing disability is on the claimant, who must prove that due to a mental or physical impairment he is unable to perform his previous work. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). If the claimant is successful, the burden shifts to the Commissioner to prove that the

claimant can perform some other type of work existing in the national economy. *See id.*

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

This court also must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993). No presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Bridges*, 815 F.2d at 624; *Corneliuis v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Furthermore, the Commissioner's "failure to . . . provide the reviewing court with

23

sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145-46. When making a disability determination, the Commissioner must, absent good cause to the contrary, accord substantial or considerable weight to the treating physician's opinion as against the opinions of other physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Walker*, 826 F.2d at 1000.

## Legal Analysis

In this case, the ALJ found that plaintiff has the severe impairments of osteoarthritis of the shoulders, cervical degenerative disc disease, myofascial syndrome, and mood disorder (R. 23). He then denied the plaintiff benefits, finding that her mental impairment does not "meet or medically equal" either the so-called "Paragraph B" or "Paragraph C" criteria, listed in 20 CFR Part 404, Subpart P, Appendix 1 (R. 23-24). In activities of daily living, the ALJ found that plaintiff has "mild restriction . . . due to alleged shoulder and spine impairments, and the resulting pain and fatigue" (R. 23). With regard to her mental impairments, the ALJ found that plaintiff's anxiety "appears to be controllable by prescribed medications and does not appear to directly produce any of her asserted limitations" (R. 23). He ultimately concluded that plaintiff

has the residual functional capacity [("RFC")] to perform

24

> light work . . . except she should only occasionally climb
> ramps or stairs, balance, kneel, stoop, crouch, or crawl;
> never climb ladders, ropes, or scaffolds; have no exposure
> to extreme cold or hazards such as unprotected heights; she
> should have only occasional overhead reaching; and she
> should perform only non-complex work with casual,
> informal social contacts.

R. 25.

The ALJ's findings are simply not supported by substantial evidence; in fact, they appear to contradict the overwhelming weight of substantial evidence, which the ALJ admitted to have discounted. The Eleventh Circuit Court of Appeals has stated that the opinion of a treating physician is to be given substantial weight in determining disability. *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986); *Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986); *Spencer on behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985). Absent good cause to the contrary, the Commissioner must accord substantial or considerable weight to the treating physician's opinion. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Here, however, the ALJ admits that he gave "little weight" to the opinions of both plaintiff's treating physician and consultative physician to the extent they opined on plaintiff's

disability because medical opinions affecting "a claimant's disability . . . are merely some of the evidence to be considered before that determination is made" (R. 26).

On September 10, 2007, Dr. Bunker, who by then had been plaintiff's treating physician for her neck and shoulder pain for at least four years, assessed *inter alia* an ability to lift ten pounds, sit for four hours, and be on her feet for two to three hours in an eight-hour workday; opined that plaintiff should never push or pull; and could only occasionally bend, stoop, or reach  (R. 628). He also stated it would be "difficult for her to tolerate her work as a hairdresser" (R. 625), a conclusion that the VE's testimony also supports (*see* R. at 55-56), and assessed plaintiff as having pain that would "cause distraction from tasks or total abandonment of tasks"  (R. 629). While the ALJ accepted some of Dr. Bunker's restrictions, he simply disregards some of Dr. Bunker's other conclusions by doubling the amount she could lift and doubling the amount of time she could be on her feet (R. 25). His only justification for this is that "[t]he apparently selective manner in which portions of the medical records have been used to support these opinions leaves them unreliable, and worthy of only little weight" (R. 26-27).

This assertion is disingenuous in light of the fact that Dr. Bunker was in the best position of any physician of record, considering that he is both plaintiff's treating physician and a pain specialist, to determine the indicia of disability in his RFC

26

assessment. The ALJ's conclusory rejection of Dr. Bunker's assessment directly contravene his duty under the law. While it is true that the Social Security Administration reserves to itself the issue of "disability" (*see* Social Security Ruling 96-5p), under the Social Security Administration's own guidelines,

> Generally, we give more weight to opinions from . . . treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . .

20 CFR 416.927(c)(2) (2012). Further, the longer a treating source has treated a claimant and the more knowledge that source has of the impairments at issue, the more weight is due that source's opinion. *See* 20 CFR 404.1527(c)(2)(i)–(ii) (2012). Thus, an ALJ may not simply dismiss a treating opinion at his whim. Here, however, the ALJ discounted not only the treating physician's opinion, but also the objective diagnoses of every single medical professional whose reports appear in the record, as well as plaintiff's own subjective description of her symptoms and pain, and provided nothing but a "conclusory" statement for doing so.

The ALJ concludes that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they

are inconsistent with the [RFC] assessment" (R. 25). Despite literally hundreds of pages of medical records cataloging plaintiff's extensive medical history with respect to treatment and management of chronic pain, the ALJ discounts plaintiff's "alleged chronic severe pain" based on two isolated statements, one of which was written by a consultative physician who saw plaintiff only once, and the other being Dr. Curtis's opinion in October 2007 that plaintiff's symptoms were "much worse than I would expect with this problem," and that because of her pain, it appeared to Dr. Curtis that plaintiff "sounds like she is not planning to work" (R. 26; *see also* R. at 636). The ALJ selectively quoted Dr. Curtis; her actual statement was that plaintiff's pain was "much worse than I would expect with this problem *but sometimes patients have severe pain*" (R. 636) (emphasis added). Dr. Curtis then opined that plaintiff would be "helped best" by a coccygectomy, which additional records indicate plaintiff was subsequently denied due to lack of insurance or other funds (R. 635, 690-91, 694-95). Dr. Curtis's conclusion was supported by physical exam; Dr. Curtis opined both that plaintiff remained "exquisitely tender over the coccyx" (R. 636) and, nearly two months later, that plaintiff should have undergone a coccygectomy "weeks ago" (R. 655). Regardless of these results, the ALJ decided that Dr. Curtis's selectively quoted statements, combined with the isolated observation of Dr. Meleth, on the one occasion he saw plaintiff, that plaintiff "sits comfortably," were sufficient to "undermine the credibility

28

of [plaintiff's] subjective complaints of pain" (R. 26).

The ALJ next accuses plaintiff of providing "inconsistent statements . . . to various doctors" (R. 26).The first series of "inconsistent statements" the ALJ cites (R. 26) is that plaintiff told "Dr. Neville" (who is a Ph.D., not a physician) that she had received "little benefit" from the nerve blocks (R. 589) but that she had told Dr. Dewees that she has been treated with numerous nerve blocks which have "helped her" (R. 26). Yet a closer reading of the record reveals that these statements are not inconsistent. Plaintiff did, indeed, tell Dr. Dewees during her consultative examination that she had received "numerous nerve blocks which helped her" (R. 731). However, the very next sentence in Dr. Dewees's report begins a half-paragraph summary of the significant pain that continued to plague plaintiff despite her numerous nerve blocks:

> She also required numerous pain medications. She says she has pain in the posterior neck that goes to the right shoulder and down to her lower back. She states that if she sits in one position for a long period of time she has flares of pain in her neck and shoulders, and also her lower back and legs. She says that if she lifts anything with her right hand it is very painful. She can only lift her purse, which is about three pounds. She is not able to bend over, stoop, crawl or climb. She says she had to lie down during most of the day because of the pain in her neck, shoulders, and right arm.

R. 731. Rather than demonstrate inconsistency, the fact that plaintiff required, in addition to nerve blocks, numerous treatments, spread out over a series of years, to

29

help relieve chronic pain is evidence that she could both "benefit" from the nerve blocks, in that they did provide pain relief to a limited degree, but receive "little benefit" from them over the long term because the nerve block treatments are stop-gap measures that only temporarily relieve some of her worst pain, and do nothing to resolve her suffering over the long term.

The second series of "inconsistent statements" the ALJ references are essentially harmless instances of plaintiff becoming confused about her own medical history (R. 26). The ALJ claims plaintiff "told Dr. Dewees that her 2003 MRI showed cervical degenerative disc disease with radicular symptoms . . . when in fact it showed mild degenerative changes at C6-C7 and no other abnormalities" (R. 26). The ALJ is correct that plaintiff's 2003 MRI showed only mild degenerative changes at C6-C7 (*see* R. at 26, 384).[16] Plaintiff's statement was "inconsistent" with the facts not in that she misrepresented her diagnosis, however; instead, plaintiff incorrectly stated the *date* of the diagnosis, an error of memory easily explained considering the literally dozens of physician visits plaintiff had over the years for her neck and shoulder pain. It was not until several years after the 2003 MRI that plaintiff was formally diagnosed with

---

[16] Though the record does indicate that on that date, February 26, 2007,, Dr. Bunker performed a fluoroscopically guided cervical epidural steroid injection at C7-T1 *as treatment for cervical degenerative disc disease and spondylosis with radicular symptoms* (R. 199-203, 485, 491-92).

cervical degenerative disc disease with radicular symptoms, as evidenced by Dr. Bunker's August 2, 2007, letter in which he stated "[s]he has been diagnosed with Cervical Degenerative Disc Disease with radicular symptoms" (R. at 465, 625). This diagnosis simply happened at a later date than plaintiff remembered in her statement to Dr. Dewees.

The final example of plaintiff's "inconsistent statements" observed by the ALJ is that she told "Dr. Neville" that she was hypertensive and had mitral valve prolapse, "conditions which show little, if any, treatment in her medical records" (R. 26). Even if this is true, it is irrelevant; plaintiff does not reference either of these conditions in her application for benefits, and does not cite either condition as a cause of her chronic pain or fibromyalgia.

The ALJ also discounts both plaintiff's subjective assessment of her mental health and the assessments of the medical professionals who examined her. The ALJ writes:

> . . . while I do not doubt that [plaintiff] experiences . . . feelings [of depression or anxiety] frequently, perhaps even daily, I do not find them to be debilitating to the extent alleged. Her condition appears to benefit from treatment, and despite her assertions of lacking financial resources, I believe that a more diligent attempt to obtain treatment for her impairments could, and should, have been made. This is particularly true in regard to prescription medications, many of which are available from multiple providers for $4 or

> less. Accordingly, I give these allegations only some
> weight.

R. 26. In other words, though plaintiff has been in treatment for mental illness and

taking anti-depressants since at least 1993 (*see* R. at 589), has no health insurance (*see*

R. at 651), no income, and gets food stamps and financial assistance from family

members (*see* R. at 591), because the ALJ thinks plaintiff could have tried harder to

find cheap medicine or another doctor, he does not believe her description of her

mental problems. He cites no objective medical evidence for his conclusion; indeed,

he plainly states it is only his "belie[f]."

The ALJ's condescending "belief" is especially egregious in light of his nearly

total failure, as required by SSR 96-7p, to "consider[,] in addition to the objective

medical evidence when assessing the credibility of an individual's statements: . . . [t]he

type, dosage, effectiveness, and side effects of any medication the individual takes or

has taken to alleviate pain or other symptoms." The ALJ stated indirectly that he did

so, insofar as he conducted "careful consideration of the entire record" (R. 25), but his

review was limited to his observations that plaintiff could have obtained medication

for $4 if she had wished (a statement totally unsupported by any objective evidence in

the record) and that Valium had been added to her medications in 2005 when she was

in the middle of a custody battle (R. 19), at least two years prior to plaintiff's alleged

onset of disability. The ALJ neglects to mention a single additional medication listed in the record, despite plaintiff's consistent and justifiable use of narcotic medications over many years in treatment for her chronic pain. Such review would have been important to the consideration of the proper weight to be accorded the opinion of plaintiff's treating physician, plaintiff's RFC, and the ultimate issue of disability.

If this were not enough, the ALJ also discounts the objective assessments of plaintiff's mental health professionals. For example, though the ALJ observed that the psychiatric review technique prepared on November 5, 2007, finds "moderate" restrictions in each of the first three functional areas, the ALJ expressly discounted this finding because "[w]hile this may well have been an appropriate finding at that point in time, [plaintiff experienced] a substantial number of situational depressors during a relatively short span in 2005 to 2007, and it is not unreasonable to conclude that her mental state has improved more recently" (R. 23). Likewise, for what he concedes are "essentially the same reasons," the ALJ determined that in social functioning, plaintiff has "mild difficulties," a determination that he reaches despite the fact that the psychiatric review technique found "moderate" limitations in this area (R. 23). In other words, the ALJ explicitly concedes that his determination is based on nothing more than his subjective opinion that plaintiff might conceivably have become less depressed in the time since the psychiatric review technique was prepared. This is the only way

to explain his conclusion that "the identifiable stressors affecting [plaintiff] have declined since 2007," such that "the 'mild' restriction is appropriate" (R. 24) because the entirety of the objective medical evidence controverts the ALJ's decision in this regard.

This case presents a particularly egregious example of an ALJ disregarding the weight of objective medical evidence in favor of his own subjective opinion about how a truly disabled plaintiff "should" present. An ALJ may only reject the opinion of a physician when the evidence supports a contrary conclusion. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). The ALJ is required, however, to state with particularity the weight he gives to different medical opinions and the reasons why. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

> Absent "good cause," an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." *Lewis*, 125 F.2d at 1440; *see also* 20 C.F.R. §§ 404.1527(d)(1)-(2). Good cause exists "when the: (1) treating physician's opinion was not bolstered by evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.2d at 1241. With good cause, an ALJ may disregard a treating physician's opinion, but he "must clearly articulate [the] reasons" for doing so. *Id.* at 1240-41.

*Winschel v. Comm'r of Soc. Security*, 631 F.3d 1176, 1179 (11th Cir. 2011). In short, "good cause" exists if the opinion is wholly conclusory, unsupported by the objective medical evidence in the record, inconsistent within itself, or appears to be based

34

primarily on the patient's subjective complaints. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *see also Crawford v. Comm'r of Soc. Security*, 363 F.3d 1155, 1159-60 (11th Cir. 2004).

None of these factors is present here. The medical record is not wholly conclusory or internally inconsistent; it is supported by nearly a decade of treatment records, for plaintiff's neck and shoulder pain, and by records dating to at least 1993 regarding plaintiff's mood disorder. It is also not based entirely on plaintiff's subjective complaints; the sheer amount of medication and number of procedures plaintiff has undergone in treatment for pain, as well as her history of missing significant time at work since at least 2000 on account of pain (*see* R. at 343, 333), support this. The ALJ does not have "good cause" for his blatant disregard of the opinions of the physicians of record, which likely explains why he provides no sufficient justification for his conclusions.

In light of these considerations, the court finds the record devoid of substantial evidence to support the decision of the ALJ. The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Before the court in this case are multiple medical opinions concerning the nature, origins, and severity of plaintiff's

35

disability due to chronic pain, from which the record demonstrates she has suffered for decades. By inferring that plaintiff was able to work from his selective review of the evidence, the ALJ substituted his opinion for that of all of the medical reports in the file, which taken together establish that plaintiff is indeed disabled.

## Conclusion

Based on the foregoing, the court is of the opinion that the decision by the ALJ was not supported by substantial evidence, and therefore the decision of the Commissioner must be **REVERSED** and this case **REMANDED** for the calculation of benefits to which plaintiff is entitled up to February 24, 2010, when she was awarded benefits pursuant to her subsequent application. The court shall do so by separate order.

**DONE** and **ORDERED** the 22nd day of May 2012.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE